**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| HECTOR HOYOS ALIFF; BIOMETRICS IMAGINEERING, INC.; TRANSACTIONAL TECHNOLOGIES INTERNATIONAL, INC.<br><br>PLAINTIFFS<br><br>V.<br><br>FOMENTO DE CONSTRUCCIONES Y CONTRATAS, S.A.; VIVENDI S.A.; ANGEL ARIAS; CARLOS AGUASCA CASTELLS; JAVIER GIL CÁCERES; STEPHAN ORSSICH, MARSCH-SALDANA & ASSOCIATES, INC.; UNIVERSAL INSURANCE CO; AMERICAN INTERNATIONAL INSURANCE CO.; LCDO. HUMBERTO GUZMAN; LCDO. JUAN CARLOS FONT.; MARTINEZ, ODELL, CALABRIA & SIERRA; XYZ INSURANCE CO'S.<br><br>DEFENDANTS | CIVIL NO.   **04-1859 (GAG)**<br><br><br>PLAINTIFFS REQUESTS TRIAL BY JURY |

## **SECOND AMENDED COMPLAINT**

TO THE HONORABLE COURT:

COMES NOW, Plaintiffs through its undersigned attorneys, and respectfully states, alleges and prays:

## I. **NATURE OF THE ACTION**

1.     This is an action brought by Héctor Hoyos Aliff ("HOYOS") in response to Defendants' intentional breach of contract and conduct to harm HOYOS business, and his personal and professional reputation. The Defendants, in order to harm

1

HOYOS and his business perpetrated a series of intentional and/or ultra vires breached and tortuous acts, directly or indirectly through the officers, directors and/or stockholders of Transactional Technologies International, Inc. ("TTI"), a Puerto Rican corporation controlled by the Defendants. By unlawfully, and illegally deciding to dissolve TTI, and sell all of its assets, Defendants illegally forced HOYOS into a critical and desperate economic situation, with the intent to force HOYOS to relinquish all proprietary rights in TTI, and otherwise cause damage to HOYOS.

2.      This is also an action for damages, injunctive and equitable relief brought pursuant to violations to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 USC §1961 et seq.

## II. JURISDICTION AND VENUE

3.      This is an action for money damages.

4.      The Court has subject matter jurisdiction under 28 USC §§ 1331 and 1332 by reason of complete diversity of citizenship.

5.      The Court has subject matter jurisdiction over this action by virtue of 18 USC §1965(a) (RICO.)

6.      Venue lies with this District Court pursuant to the provisions of 18 USC §1965.

## III. <u>PARTIES</u>

7.      Plaintiff, Mr. Héctor Hoyos Aliff ("HOYOS") is an American citizen domiciled in the State of New York. HOYOS is a Puerto Rican entrepreneur who has

2

dedicated himself to the research and development of services and products in the field of science and technology.

8.     Biometrics Imagineering, Inc. ("BI"), is a corporation organized under the Laws of the Commonwealth of Puerto Rico, and with the principal place of business in the Commonwealth of Puerto Rico.

9.     Transactional Technologies International, Inc. ("TTI"), is a corporation organized under the Laws of the Commonwealth of Puerto Rico, and with the principal place of business in the Commonwealth of Puerto Rico.

10.     Plaintiff HOYOS also files this action on behalf of TTI, in which corporation he was a minority shareholder, as a derivative action, to recover compensation for the economic injury caused by the defendants to TTI, due to their failure to comply with the fiduciary duties they owed to the corporation notwithstanding plaintiff's efforts to have them comply as alleged herein below.

11.     Co-defendant FOMENTO DE CONSTRUCCIONES Y CONTRATAS, S.A. ("FCC") is a Spanish corporation domiciled in Madrid, Spain that has a controlling interest with VIVENDI in PROACTIVA.

12.     PROACTIVA is a Spanish partnership or corporation domiciled in Madrid, Spain.

13.     Individual Co-defendants AGUASCA, ARIAS, GIL and ORSSICH are Spanish nationals who are directors, officers, representatives, agents or employees of VIVENDI/FCC and who also served as directors or officers of TTI and/ or Proactiva.

3

14.   UNIVERSAL INSURANCE CO. ("UNIVERSAL") is an insurance company domiciled in the Commonwealth of Puerto Rico.

15.   AMERICAN INTERNATIONAL INSURANCE CO. ("AMERICAN") is an insurance company domiciled in Wilmington, Delaware.

16.   MARTINEZ, ODELL, CALABRIA & SIERRA ("MOCS") is Professional Corporation domiciled in the Commonwealth of Puerto Rico.

17.   HUMBERTO GUZMAN, ESQ. ("GUZMAN") is an American citizen domiciled in the Commonwealth of Puerto Rico. GUZMAN is a Puerto Rican lawyer who has represented TTI in the present case and during the arbitration proceedings held in this case.

18.   JUAN CARLOS FONT, ESQ. ("FONT") is an American citizen domiciled in the Commonwealth of Puerto Rico. FONT is a Puerto Rican lawyer who has represented TTI in the present case and during the arbitration proceedings held in this case.

19.   At all times relevant herein the Defendants conducted, either by themselves, or through their agents, business transactions within Puerto Rico, and they also participated, either by themselves or through their agents, within Puerto Rico in the commission of the injury object of this complaint.

20.   At all times relevant herein the Defendants, jointly and severally, and acting in concert, wrongfully and with an improper purpose breached and interfered with the contractual relations alleged herein below.

## IV. <u>FACTUAL CLAIMS</u>

21. On or about November 26, 1998, HOYOS began a series of negotiations and communications with a European based multinational known as VIVENDI in an effort to raise capital and create a joint venture for several business enterprises developed by HOYOS.

22. Among the business ventures was a project called RESERVA ("RESERVA" or the "PROJECT") composed of two (2) parts:

(1) **hardware/software manufacturing** to be carried out by "BI", that entailed operating a research, development and technology center to develop, make, manufacture, produce, prepare, and process computer hardware/software and communications systems and protocols; and

(2) **commercial operations** to be carried out by TTI that entailed the marketing, education, contracting, signing-up of clients and customers (i.e. utilities, government agencies, cable TV, telephone and cellular telephone companies, banks and financial institutions, and other private and commercial institutions), and installing of equipment. The commercial operation involved the development, installation, maintenance, marketing and education related to a computer and communications network system allowing the general public to pay their utilities, telephone, cellular, Cable TV, bank, mortgage, auto and other expenses, and make deposits and other transfers at conveniently located units throughout Puerto Rico. All of these payments could be made all at once and at any <u>one location</u> (at units similar to ATH/ATM units), without waiting in long lines, open 24 hours, 7 days a

week, receive verified receipts for each transaction; bank, government and private enterprises (the potential customers and clients of TTI) could reduce overhead and personnel expenses, while paying a low reasonable fee for each transaction to TTI.

23. The majority of these negotiations communications were initially carried out with Mr. Regis Mesnier ("MESNIER"), a high-ranking officer of VIVENDI in Paris, France. VIVENDI is a large multinational group of companies with business interests around the world.

24. Although VIVENDI was also interested in forming some kind of business venture with HOYOS, particularly in connection with RESERVA, VIVENDI began a merging process with FCC of Spain, and the RESERVA project began to slowly shift from being a VIVENDI project to becoming a VIVENDI/FCC PROJECT.

25. HOYOS was at the time the controlling stockholder of BI. BI engineered, developed, produced and owned the proprietary software, design and concept of RESERVA and had authored guidelines related to the marketing, introduction and installation of RESERVA equipment throughout Puerto Rico.

26. Mr. Fernando Pina a VIVENDI/FCC executive, at that time running the operations of PRASA (The PR Sewer and Aqueducts Authority) in PR under contract with Proactiva MedioAmbiente, was ordered by MESNIER to personally meet with HOYOS, which meeting occurred on April 29, 1999, and there informed him that VIVENDI/FCC's Executive Committee had been evaluating the possibility of entering into a deal whereby VIVENDI/FCC would purchase 10% of BI for US 4 million

dollars and would provide a US 20 million dollars guarantee in consideration for acquiring 50% of TTI stock.

27. VIVENDI/FCC viewed with optimism an investment in BI in as much as HOYOS had been able to attract Popular, Inc. ("BPPR") to make a substantial investment into the RESERVA project.

28. Suddenly, however, on June 11, 1999, the VIVENDI/FCC group informed HOYOS that they were "dropping" the RESERVA project because it allegedly did not meet with the VIVENDI/FCC Group's "minimum economic financial requirements".

29. HOYOS notified Mesnier that he was considering to pursue legal recourse since the parties had already entered into several preliminary agreements; at VIVENDI/FCC's urging, HOYOS had invested considerable time, effort, money and resources in furthering the PROJECT; and had a binding verbal commitment and contractual agreement from VIVIENDI/FCC, all of which were detailed in the HOYOS letter to MESNIER on June 16, 1999, RE: "Agreements and Understandings by and between VIVENDI/FCC and BI/TTI".

30. Shortly thereafter, VIVENDI/FCC reconsidered their position and decided to participate in the RESERVA project, and the parties reengaged their negotiations.

31. These negotiations bore fruit and on November 3, 1999, HOYOS, in his personal capacity and as controlling proprietor of BI and TTI, entered into two agreements in Madrid, Spain ("ACUERDO MARCO" and "STOCKHOLDERS'

AGREEMENT") by which VIVENDI/FCC through PROACTIVA became owner of 70% of the capital stock of TTI, assuming full control and management of the company, while HOYOS retained 30% thereof, and became the non-executive President of the Company without any decision making capability and sub-serviant to the authority of the General Manager appointed by Proactiva, Mr. Stefan Orssich. Although VIVENDI/FCC entered into the ACUERDO MARCO and STOCKHOLDERS' AGREEMENT through PROACTIVA, they both continued to have contractual obligations with plaintiffs to obtain the success of the PROJECT.

32.   PROACTIVA is, upon information and belief, a Spanish partnership or corporation wholly-owned and/or controlled by VIVENDI/FCC, and was formed for the purpose (if not exclusive purpose) of holding VIVENDI/FCC'S 70% stake in TTI. In mid 2000, Vivendi acquired control in FCC.

33.   Pursuant to the contractual agreements reached by the parties the success of the PROJECT called for and required the undivided, focused and total dedication, cooperation and support of both VIVENDI/FCC and HOYOS.

34.   As part of the ACUERDO MARCO and STOCKHOLDERS' AGREEMENT, VIVENDI/FCC through PROACTIVA was compelled to make a capital contribution of $1,400,000.00 to TTI, while HOYOS had to contribute $600,000.00 in cash or kind.

35.   Further to the ACUERDO MARCO and STOCKHOLDERS' AGREEMENT, VIVENDI/FCC through PROACTIVA was to transfer directly to BI the amount of $776,939.00 on November 4, 1999, as an initial deposit to a Sales Contract ("SALES CONTRACT") between TTI and BI, signed on November 4, 1999.

36.  Under the SALES CONTRACT, BI agreed to sell to TTI an Electronic Network of Automated Services composed of a Central Processing System, central systems communications infrastructure, associated software as well as Interactive Transaction Machines ("ITM's"), associated systems, and all required equipment, software, and services, as described in Exhibit 1A and 1B of the SALES CONTRACT. The product of all to be provided by BI was guaranteed by BI and TTI with a performance bond issued by Eastern American Insurance Corporation, a subsidiary of Universal Insurance. Said bond was procured and secured by Marsh-Saldana and Associates for BI.

37.  The PROJECT was slow to start because of Defendants' intentional inaction and HOYOS was compelled to commence and maintain operations on behalf of TTI using BI personnel and resources which adversely affected BI's financial position.

38.  Consequently, on or about October 5, 2000, BI informed VIVENDI/FCC through PROACTIVA in writing that as of said date TTI owed to BI $688,525.73 for goods and services provided for under the Sales Contract and/or for additional goods and services specifically requested by TTI and provided by BI related to a full fledged and costly process of establishing needed infrastructure in Puerto Rico.

39.  TTI refused to pay said amount. BI then firmly and clearly explained that TTI's failure to pay the outstanding invoices were causing BI to fail to meet its financial obligations, and was otherwise placing BI in a critical economic situation. (This controversy forced BI to sue TTI for collection of monies in the Superior Court

of Puerto Rico, San Juan Part, Civil No. KPE01-2549. As of this date TTI owes BI approximately $1,000,000.00.)

40. Shortly thereafter, in repeated telephone conversations between HOYOS and representatives of TTI, and VIVENDI/FCC through PROACTIVA, HOYOS was told that neither VIVENDI/FCC through PROACTIVA nor TTI would pay any monies to BI, and that VIVENDI/FCC through PROACTIVA, as 70% owner of TTI, would not authorize any payment to BI for past due balances.

41. VIVENDI/FCC through PROACTIVA insisted on naming TTI's General Manager to run and be in charge of TTI's commercial and start-up operations.

42. VIVENDI/FCC through PROACTIVA named Stefan Orssich ("ORSSICH").ORSSICH was (before and during his tenure as General Manager of TTI) and continues to be an employee of FCC.

43. ORSSICH has an education and on-the-job training in accounting and bookkeeping. He had no or very little experience in management, start-up operations, marketing, publicity and sales.

44. ORSSICH continued to be an employee of FCC and limited himself to following FCC's instructions. ORSSICH proved to be incapable, unable and/or unwilling to lead TTI into successfully completing RESERVA. Furthermore, instead of managing operations, and being proactive in marketing and sales, either through his own will and/or upon orders of VIVENDI/FCC he limited his role to accounting and bookkeeping and otherwise acting as VIVENDI/FCC's watchdog. During this

entire period, the only contracts signed with customers and clients were signed due *exclusively* to the efforts and contacts of HOYOS.

45.  It is at this juncture that RESERVA began to be seriously jeopardized. ORSSICH followed, conformed and was guided almost exclusively by the directors named by VIVENDI/FCC through PROACTIVA, to wit: Carlos Aguasca Castells, Angel Arias, and Javier Gil Cáceres ("PROACTIVA DIRECTORS"). With the exception of Angel Arias, these individuals were, are, and remain directors, officers, shareholders, representatives, agents and/or employees of VIVENDI/FCC.

46. At all times, as to business transactions relevant herein, the Defendants, jointly and severally and acting in concert among themselves, obviated any corporate separateness between themselves and PROACTIVA, and in furtherance of their improper purpose they personally maintained full control and took all decisions in PROACTIVA related to the RESERVA PROJECT.

47. At all times, as to business transactions relevant herein, the PROACTIVA majority DIRECTORS acted as mere conduits or agents through whom the Defendants's accomplished their wrongful intentions, and the implementation of their wrongful orders and instructions in relation to the RESERVA PROJECT.

48.  Through their control of the majority of these PROACTIVA DIRECTORS, and in furtherance of their improper purposes, the Defendants, jointly and severally, and acting in concert among themselves, would override and ignore all suggestions and/or all recommendations on how to successfully complete RESERVA coming from the other directors Héctor Hoyos and Filomena Ruffa (the "HOYOS

DIRECTORS") as well the third party consultants hired by TTI with the Board's approval.

49.  The intentional wrongful actions and omissions of the defendants that were conducted through the PROACTIVA DIRECTORS were aimed and directed exclusively at protecting the capital investment of VIVENDI/FCC and ignoring the fiduciary trust/duty that the PROACTIVA DIRECTORS had with TTI.

50.  In compliance with the Defendants' wrongful intentional orders and instructions the PROACTIVA DIRECTORS and ORSSICH were not proactive, and did nothing to promote and advance TTI's commercial operations.

51.  As a result of the Defendants' breach of its fiduciary duties TTI's economic situation began to seriously deteriorate. As a direct result thereof, the Defendants instructed the PROACTIVA DIRECTORS to have TTI abandon RESERVA, shut down and liquidate all of its assets, and otherwise dissolve it.

52.  During an emergency session of the TTI Board of Directors held in November of 2001, HOYOS vehemently opposed Defendants' wrongful intentions and instead offered to acquire TTI and/or absorb all monthly operational expenses since RESERVA was his original idea, and HOYOS had committed his personal, business professional reputation and capital on the PROJECT and its success.

53.  Ignoring HOYOS' expressed objections and in violation of the ACUERDO MARCO and STOCKHOLDERS' AGREEMENT, in December of 2001 the Defendants ordered the PROACTIVA DIRECTORS, without the extraordinary 90% majority required under Article 3(a) of the STOCKHOLDERS' AREEMENT and Articles

5.1 (b) and (d), of the ACUERDO MARCO, to dissolve and liquidate all of TTI assets, thereby dismantling the RESERVA project.

54. Through these wrongful actions and illegal interference of the contractual obligations between Hoyos and Proactiva, the Defendants fraudulently had the PROACTIVA DIRECTORS and ORSSICH liquidate all of TTI's assets in a clear breach of their fiduciary duty, and ultra vires.

55. Defendants tortuous interference of third party contractual relations was the direct cause of the closing of Biometrics Imagineering Inc. a going concern, at that point valued by outside third party investors in one hundred twenty five million dollars ($125,000,000.) Biometrics efforts were all focused on the ITM and Cyclops machines and on RESERVA with TTI. Therefore, the company could not economically sustain itself alter TTI closed its operations, particularly since the closing resulted in the pullout of the Portuguese Group SLN, whom had acquired 25% of BI on a valuation of one hundred twenty five million dollars ($125,000,000) with an agreement which required an additional investment in BI of twenty million dollars ($20,000,000.)

56. On May 2001, Hoyos and Biometrics had begun negotiations with the Portuguese Lhusa Negotiations Society ("SLN") SLN acquired all Intellectual Property over the ITMs (outside of Puerto Rico).  The negotiations were geared towards implementing the already established ITM network in other countries around the world.

13

57. On June or July of 2001, Biometrics sold 25% of the company to SLN for the valued price of thirty-two million two hundred and fifty thousand dollars ($32,250,000.00). An additional ninety six million seven hundred and fifty thousand dollars ($96,750,000.00) would have been acquired from BI shareholders under the terms of said contract.

58. Due to Defendant's illegal third party interference of Hoyos' and SLN's contractual obligations, SLN reneged its obligations under said contract. Further, because TTI illegally closed its operations and because of Defendant's defamatory statements regarding the ITM machines, BI and HOYOS lost all economic support and credibility regarding the ITM's and the RESERVA project.

59.   On or about August 2005, HOYOS called SALDANA to inquire about some insurance policies of BI. During those conversations, SALDANA informed HOYOS that TTI had some insurance policies with UNIVERSAL and with AMERICAN that covered the period of the events in this case and that one of the polices was a Directors and Officers Policy.

## V. TOLLING

60. Plaintiffs' tort claims were tolled by the filing of civil actions in civil case number 02-11189 (PG) filed in the Federal District Court for the District of Puerto Rico on February 7, 2002, and by the counterclaim filed by the defendants on December 30, 2002, in an arbitration procedure filed by Proactiva and TTI against Hoyos, BI and Transactional Technologies, LTD., on October 9, 2002.

## VI. <u>CAUSES OF ACTION</u>

### <u>COUNT ONE</u>

61.     The above stated factual claims are repeated and incorporated by reference as if fully set forth herein.

62.     Defendants' third party interference of contractual relationships and obligations between Hoyos, Proactiva and SLN related to the commercial and corporate transactions of the RESERVA PROJECT adequately constituted and/or caused a breach of said agreements entitling the Plaintiffs to recover all damages sustained as a consequence thereof, which are estimated in a money amount of no less than $200,000,000.

### <u>COUNT TWO</u>

63.     The above stated factual claims are repeated and incorporated by reference as if fully set forth herein.

64.     Defendants proceeded to defame HOYOS with SLN directors and/or officials causing him damages which have led to the loss of clients and earnings.

65.     HOYOS requested Defendants and their representatives and agents to refrain from continuing to defame HOYOS to no avail. Defendants persisted in making such false public charges against the Plaintiff HOYOS.

66.     The Defendants are liable to Plaintiff HOYOS for defamation, for which reason HOYOS is entitled to recover damages from Defendants in a money amount of no less than of $200,000,000.

### <u>COUNT THREE</u>

67.  The above stated factual claims are repeated and incorporated by reference as if fully set forth herein.

68.  It is the duty of a board of directors to manage the corporate affairs solely in the interest of the corporation, quite regardless of the effect of its policies and management upon the fortunes of individual shareholders or an individual group of shareholders in the corporation. And directors and other officers may not legally manipulate the affairs of the corporation primarily with the design of securing its control to one particular group of shareholders, or of excluding another group from the exercise of its corporate rights.

69.  As to their **breach of fiduciary duty or trust**, the liability of the FCC/PROACTIVA DIRECTORS and ORSSICH is personal, joint and several for the willful mismanagement, neglect and misconduct of corporate affairs by carrying out the orders of VIVENDI/FCC and being guided exclusively by the interests of VIVENDI/FCC to the inherent and obvious detriment of TTI, with said liability ascending to a money amount reasonably estimated in no less than $200,000,000.

70. A director is further liable to a corporation's shareholders where the director acts outside the scope of his authority to the injury of the corporation. Thus if he willfully performs an act which he knew is unauthorized, such director or directors are clearly liable for any resulting damage. If the director or directors knowingly exceeds his or their authority, the director or directors are liable without regard to the exercise of reasonable care.

71. PROACTIVA DIRECTORS are personally, jointly and severally liable for any and all damages caused by **acts ultra vires and illegal** where they <u>knowingly</u>

contravened provisions of both the SHAREHOLDERS' AREEMENT and the ACUERDO MARCO, which damage and liability ascends to the amount of no less than $200,000,000.

72. As mentioned previously directors and officers owe the corporation and its stockholders the active duty of honesty and good faith in the transaction of the business of the corporation and in their dealings with it. They are bound to use the utmost good faith and loyalty for the furtherance and advancement of its interests. Accordingly, directors and officers of a corporation are liable for a loss to the corporation from the fraud of such directors and officers. Where there is a breach of a legal or equitable duty arising out of a fiduciary relationship, a presumption of fraud arises. Unlike actual fraud, **constructive fraud** requires neither actual dishonesty nor intent to deceive. Because of these fraudulent acts SLN reneged its obligations under said contract because TTI illegally closed its operations. Whereby, BI and HOYOS lost all economic support and credibility regarding the ITMs and the RESERVA project. Because PROACTIVA DIRECTORS' and ORSSICH's constructive fraud and direct consequential damage to the Plaintiff is as an individual shareholder or affecting the Plaintiff shareholder directly, the liability of PROACTIVA DIRECTORS and ORSSICH is personal, joint and several in favor of the individual Plaintiff, which damage and liability ascends to an amount of no less than $200,000,000.

## COUNT FOUR

73. The above stated factual claims are repeated and incorporated by reference as if fully set forth herein.

74. HOYOS was owner of some insurance policies acquired for BI trough SALDANA's Insurance Company. SALDANA informed HOYOS that TTI also had some

insurance policies with UNIVERSAL and with AMERICAN. Those policies covered the director and officer's liability, as well corporate liability, including but not limited to product liability.

75.    DEFENDANTS unlawfully and knowingly did not comply with their duty of notifying the insurance companies, that is UNIVERSAL and AMERICAN of the action brought by them against one of the officers of the company, HOYOS. DEFENDANTS knew that the policies covered HOYOS from any action brought against him and that a notification to the insurance companies was in order to activate the policies.

76. DEFENDANTS unlawfully, willfully and knowingly did not inform HOYOS of the existence of the insurance policies of UNIVERSAL and AMERICAN that covered him as an officer of the company in the action brought against him.

77. Each of the aforesaid violations by the Defendants were part of a common and continuous pattern of fraudulent schemes, with the sole intention to conspire against HOYOS and perpetrated for the same or similar purposes, thus constituting a "pattern of racketeering activities as defined in 18 USC §1961 (s.)

78. Upon information and belief, for the purpose of executing and attempting to execute the aforesaid scheme to defraud, the Defendants repeatedly caused to be made and made interstate telephone calls and other uses of interstate wire facilities to and from the District and elsewhere, in repeated violation of 18 USC §1343 (wire fraud). These communications included not only intestate telephone calls among employees of TTI, PROACTIVA, FCC (San Juan/Madrid), but also includes those of BI, PROACTIVA, VIVENDI, FCC (San Juan/Madrid,) MOCS, GUZMAN AND FONT, the purpose of which was to defraud HOYOS and/or BI.

79. Each of the aforesaid violations of the Defendants of the mail fraud and wire fraud statutes 18 USC §1341 and §1343, constitutes an instance of "racketeering activities" as defined in 18 USC §1961(l).

80. The multiple acts of racketeering activity by the Defendants were interrelated, part of a common and continuous pattern of fraudulent schemes, and perpetrated for the same or similar purposes, thus constituting a "pattern of racketeering activities" as defined in 18 USC §1961(s.)

81. By reason of the aforementioned circumstances and events the DEFENDANTS unlawfully, willfully and knowingly maintained, directly and indirectly and interest in and control of TTI through a pattern of racketeering activity in violation of 18 USC §1962(b.) In doing so, Defendants deceived HOYOS, requiring him to incur in substantially greater expenses and in financial losses than he would otherwise have been the case.

82. By reasons of the aforesaid circumstances and events all Defendants along with others unlawfully, willfully and knowingly conspired and continue to violate the provisions of 18 USC §1962(b) and 1962(c), in violation of 18 USC §1962(d.)

83. Each of the aforesaid violations by the Defendants were part of a common and continuous pattern of fraudulent schemes, and perpetrated for the same or similar purposes, thus constituting a "pattern of racketeering activities as defined in 18 USC §1961 (s.), which damage and liability ascends to an amount of no less than $200,000,000, which under 18 USC §1964(c) are subject to be tripled up to $600,000,000.00.

## COUNT FIVE

84. The above stated factual claims are repeated and incorporated by reference as if fully set forth herein.

85. GUZMAN and FONT were attorneys for MOCS at the beginning stages of the present case.

86. GUZMAN and FONT, as attorneys of the DEFENDANTS knew or should have known of the existence of some insurance policies that covered their clients against an adverse judgment in a legal case. They also knew that the policies covered (HOYOS) the directors and officers from an action brought against them in their official capacities.

87. Co-defendants GUZMAN and FONT, unlawfully and knowingly did not inform HOYOS and or his attorneys, of the existence of those insurance policies. Moreover, they did not comply with the due diligence of informing the insurance companies of the actions brought against one of the officials of their client corporation.

88. Each of the aforesaid violations by GUZMAN and FONT were also part of a common and continuous pattern of fraudulent schemes, and perpetrated for the same or similar purposes, thus constituting a "pattern" of racketeering activities as defined in 18 USC §1961 (s.)

89. Because GUZMAN, FONT and all DEFENDANT'S fraud and conspiracy actions direct consequential damage to the Plaintiff as an individual shareholder and/or affecting the Plaintiff shareholder directly, the liability of GUZMAN, FONT and all DEFENDANTS is personal, joint and several in favor of the Plaintiff, which damage and liability ascends to an amount of no less than $200,000,000.00.

## VII. PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request the Court to enter Judgment in favor of plaintiffs, granting them:

A.     All the money amounts requested in the complaint.

B.     An award of cost of this suit, including reasonable attorney's fees and any other associated costs and legal interest.

C.     Any other such further relief as this Court deems just and proper

RESPECTFULLY SUBMITTED. In San Juan, Puerto Rico, this 20th day of June, 2006.

I HEREBY CERTIFY that on June 20th, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Eric M. Quetglas Jordán, quetglas@hotmail.com; Humberto Guzmán Rodríguez, (hguzman@qsglaw.com), and Giancarlo Font García (gfont@drcprlaw.com).

**s/ ERIC M. QUETGLAS JORDAN**
USDC-PR #202514
**QUETGLAS LAW OFFICES**
PO Box 16606
San Juan PR 00908-6606
Tel:(787)722-0635/(787)722-7745
Fax: (787)725-3970
Email: quetglaslaw@hotmail.com

**s/ ANIBAL LUGO MIRANDA**
USDC-PR # 130013
E-mail: almlugo@microjuris.com
**LUGO MIRANDA LAW OFFICES**
252 Ponce de León Ave.
Suite 901, Citibank Tower
San Juan, PR 00918